**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Case No. 11-cv-03182-RM-GPG

TIMOTHY SAWATZKY,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**

---

     The Court presided over a trial to the court in July of 2013 in this Federal Tort Claims Act ("FTCA") case against Defendant United States of America ("Defendant"), for damages allegedly sustained in an automobile accident where a postal vehicle backed into a privately-owned van in a parking lot.  The evidence and arguments of counsel raise two main contested issues – whether the automobile accident caused Plaintiff Timothy Sawatzky's injuries, and if that is the case, what damages he is entitled to recover.  Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

1.     Plaintiff Timothy Sawatzky ("Mr. Sawatzky" or "Plaintiff") is a master plumber and owner of a small business called Four Seasons Plumbing, which he started in 2005.  On August 17, 2009, he went to the Double Tree Apartments in Grand Junction (the "Double Tree") on a service call and parked his company van in the Double Tree parking lot.

2.      On August 17, 2009, United States Postal Service ("USPS") employee Vicky Gurule was on her regular route delivering mail in Grand Junction, Colorado.

3.      Ms. Gurule, in her USPS delivery vehicle, parked in a space in the parking lot of the Double Tree in order to deliver mail.  Upon completing her mail delivery and attempting to leave the Double Tree, she backed her vehicle into the rear of Mr. Sawatzky's van.

4.      At the time of the accident, Mr. Sawatzky's van was in park, with the engine off, with the parking brake off, and with the front wheels turned approximately 45 degrees to the left.

5.      Mr. Sawatzky's van was a steel frame 1994 Ford Econoline, estimated by one witness to weigh approximately 7000 pounds.  Ms. Gurule's postal vehicle was an aluminum body mail delivery "truck" estimated by the same witness to weigh approximately 2500 pounds.

6.      At the time of the accident, Ms. Gurule was "inching backwards" with her foot on the brake.  She estimated her speed at "less than 5 miles an hour, less than 3 miles an hour."

7.      There was one neutral witness to the impact, Grant Walker ("Mr. Walker"), who was not called at trial.  Mr. Walker's statement was, however, included in a police report which was admitted into evidence as Exhibit 1 without objection or limitation.  The police report states that Mr. Walker was looking at the postal vehicle at the time of impact, but that he said "he did not see Tim in the van or see Tim exit the van, but he did see Tim walk around the rear of the van after the

crash."  The report says that Mr. Walker referred to the postal vehicle as "backing at 5 mph or less."

8.      Mr. Sawatzky testified extensively about the accident.  According to Mr. Sawatzky, at the time of impact he was standing outside the open driver's side door, bent at the waist, leaning into his van, and reaching for a pad of paper, which was under the driver's seat.

9.      Mr. Sawatzky testified that at the moment of impact it felt like his van was "slamming into [his] body."  He testified that he was knocked from under the seat into his dash and door.  He also testified that the force of the impact moved his van "about a foot or so."

10.     Other than Mr. Sawatzky, no person testified at trial as an observer of Mr. Sawatzky's position with respect to the van at the time of impact.  Ms. Gurule did not see him at the time of the accident and could not say whether he was leaning into or wholly outside his van.  Mr. Walker's observations were reported as set forth above.

11.     Mr. Sawatzky described the damage to his vehicle caused by the collision as depicted in pages 15-17 of Exhibit 74.  The identified areas included significant scrapes on the rear and right side of his rear bumper which were at a 90 degree angle to each other.  When asked on cross-examination how two different sides of his vehicle were impacted, Mr. Sawatzky testified that:

> It's possible that [Ms. Gurule] -- once she hit it, she moved again and scratched it, and then that's about the time when I walked around and seen her.

12.     After the accident, Ms. Gurule called her supervisor.

13.   After the accident, Mr. Sawatzky called the Grand Junction Police Department and a co-worker.

14.   Joe Rodriguez was Ms. Gurule's supervisor with USPS in Grand Junction and came to the accident scene in response to Ms. Gurule's call.  At trial, he had virtually no memory of his activities or observations on scene due to severe memory loss caused by chemotherapy and radiation treatments for cancer.

15.   During Mr. Rodriguez's testimony, Defendant stipulated that there was a duty of care owed to Mr. Sawatzky, and that such duty was breached by Ms. Gurule on August 17, 2009.

16.   The Court finds that United States owed a duty to Mr. Sawatzky and breached that duty when Ms. Gurule backed her vehicle into Mr. Sawatzky's van.

17.   Mr. Rodriguez took a written statement from Mr. Sawatzky at the accident scene which was admitted into evidence.  (Exhibit 3.)  In it, Mr. Sawatzky stated that his van was "in park" and that he was "leaning in looking under the driver's seat for paperwork" at the time of impact.  According to this handwritten statement, the jolt "knocked me into the driver's door with my head underneath the seat wrenching my neck and back also my left shoulder."

18.   The Court interprets this to mean that Mr. Sawatzky claims his trunk and legs rotated left and into the door while his head and upper torso remained under or near the driver's seat.

19.   Ms. Gurule was disciplined by the USPS for her role in the accident and required to take remedial driver training.

20.     Grand Junction Police Officer Allen Kwiatkowski arrived on the accident scene in response to Mr. Sawatzky's call.  He arrived at 12:50 pm.

21.     Officer Kwiatkowski interviewed Mr. Sawatzky, Ms. Gurule and Mr. Walker.  At Mr. Sawatzky's urging, the officer took numerous photographs of the scene.  Mr. Sawatzky reported to the officer that he had "collided" with the driver's door and dash and had pain in his neck, back, shoulder and left side.  (Exhibit 1.)  Ms. Gurule testified at trial that she heard someone say that Mr. Sawatzky hurt his neck, head and shoulder.

22.     Despite this, on completing his accident report, Officer Kwiatkowski listed the total number of "injured" at the scene as zero.

23.     Mr. Sawatzky testified that there were skid marks at the scene and that they are observable, although faint, in Officer Kwiatowski's photographs.

24.     When Mr. Sawatzky was specifically asked at trial whether he observed any skid marks at a specific location, under the tires of his van, he responded that "I -- I don't think I looked."

25.     At the scene of the accident, Mr. Sawatzky asked Officer Kwiatkowski to take a photograph of a skid mark under the van, purportedly caused by Mr. Sawatzky's van being pushed forward by the impact of the collision.  After Mr. Sawatzky's vehicle was moved, Officer Kwiatkowski saw no skid marks, but took photographs as requested by Mr. Sawatzky.

26.     Having reviewed the photographs and considered the testimony, the Court concludes that there were no skid marks made at the scene of the accident.

27.   Officer Kwiatkowski reconstructed the accident and determined that in backing up, the left side rear of the postal vehicle (the driver's side on normal vehicles) contacted the passenger side rear corner of the back bumper on Mr. Sawatzky's van.

28.   Officer Kwiatkowski based his conclusion as to the point of impact on observation of a small dent in the aluminum body of the postal vehicle which had small flecks of rust deposited on it and a rust spot on the bumper of the van which had paint flecks deposited on it.  Additionally, Officer Kwiatkowski noted that there appeared to be some deposits of dried dirt on the top surface of the bumper of the postal vehicle below the body dent, which he concluded dropped from the underside of the van's bumper.  (The postal vehicle's bumper was lower than that of the van and would have slid under the bumper of Mr. Sawatzky's van.)

29.   Officer Kwiatkowski took a number of photographs of the vehicles and the scene which were admitted into evidence.

30.   As to the scratch marks or scrapes in the vicinity of the right rear corner of Mr. Sawatzky's van, Officer Kwiatkowski "assumed" that these marks "may have also been involved" in the accident because they "appeared to be fresh." However, Officer Kwiatkowski was unable to identify any portion of the postal vehicle which would have caused such marks, as there was no damage on the postal vehicle in any area that could have made such marks.  Ultimately, Officer Kwiatkowski concluded:

> So I did the best I could with what I was given and tried to gather the photographs.

31.    The Court, having carefully examined all of the photographic evidence and having considered the pertinent testimony, finds that the point of impact was a rust spot on Mr. Sawatzky's bumper.  At this location, there is neither a clear dent nor other discernible damage.  The Court finds that the scratch marks bracketing the rust spot and lying one on the side and back surface of Mr. Sawatzky's van's rear bumper were not caused by the accident.

32.    Officer Kwiatkowski, whom Mr. Sawatzky presented as having training in accident investigations and reconstruction, referred to the accident as "so minor, so low speed."  When asked whether the accident could have caused Mr. Sawatzky's van to move "more than a foot," he replied "absolutely not."  When asked if it could have moved "a foot," he replied "not a foot."   Officer Kwiatkowski testified that the impact of the postal vehicle would only have caused Mr. Sawatzky's van to load and unload on its own suspension rather than move his van.

33.    Officer Kwiatkowski included the following statement in his report:

> P-2, Sawatzky stated that the impact was "significant" and that there were skid marks at the collision location.  I looked at the point where the tires of the V-2 [van] were, and could not locate any skids, I did photograph the location as pointed out by P-2.

34.    When asked why he documented what was *not* there, Officer Kwiatkowski responded:

> In all fairness to everybody involved, I had been a police officer for a long time and admittedly I'm probably pretty jaded with coming to something so minor, so low speed, private parking lot, and with a claim of injury, I probably was a little bit disbelieving.

35.     The Court finds that the accident in question involved, at best, a low speed, mild impact in the nature of a tap.

36.     Mr. Sawatzky's description of what happened to his body at the time of impact was, at times, difficult to reconcile with what one would expect of a rear impact. At one point, while looking at a photograph of the underside of the driver's seat, Mr. Sawatzky described the picture as:

> That's where my neck and my right side hit after my left side --  actually, that's where my neck and my right side was hit from the jolt of the van after my left side -- excuse me for a second -- after my left side was knocked into the door jamb.

37.     He again repeated that his right side was struck "after" his left side was knocked into the dash and door jamb.  During this sequence, he only corrected himself when his counsel interjected and said:

> You keep -- you keep using the word after, sir.  Which side of your body was hit first?

38.     Mr. Sawatzky testified that when he left the scene, he went "directly" to Community Hospital.  He testified that he did not stop off anywhere and went to the emergency room "because I was in pain and I felt I had better get checked out."

39.     The Court finds that Mr. Sawatzky did not go "directly to the Community Hospital."  Although Mr. Sawatzky did not testify as to the time he left the scene, and Officer Kwiatkowski could not remember how long he was at the scene, the Court heard testimony as to the entirety of events occurring at the scene.  Officer Kwiatkowski considered the incident to be a minor matter and indicated no injuries on his report.  He talked briefly to Mr. Sawatzky, Ms. Gurule and a third

party witness, examined the vehicles, and took some photographs.  The Court

finds that the police business at the scene, at most, could have taken no more than

an hour.  Officer Kwiatkowski's report, Exhibit 1, shows that the scene of the

accident was at 2260 N. 13th Street in Grand Junction.  It also shows that Officer

Kwiatkowski arrived on the scene at 12:50 p.m., or shortly before 1:00 p.m.  The

Community Hospital Emergency Room records, Exhibit 23, show that Mr.

Sawatzky drove to the hospital and first arrived at 1450, or shortly before 3:00

p.m. and some two hours after Officer Kwiatkowski first began to conduct

business at the scene of the accident.  (*Id*. at 16.)  Moreover, the records show that

the address of the hospital is 2021 N. 12th Street in Grand Junction – at most, a

few blocks from the scene of the accident.  Mr. Sawatzky's testimony as to the

timeline immediately after the accident is inaccurate.

40.    Mr. Sawatzky was evaluated at Community Hospital by Paul E. Numsen, M.D.

Dr. Numsen ordered x-rays of Mr. Sawatzky's spine, which revealed no evidence

of fracture or dislocation and some likely chronic underlying degenerative

changes, which Dr. Numsen deemed to be mild.

41.    Dr. Numsen diagnosed a paraspinal muscle strain, gave Mr. Sawatzky a

prescription for Percocet and discharged him.

42.    Tarek Arja, D.O., was the doctor to whom Mr. Sawatzky was referred for follow-

up after the August 2009 accident.  Dr. Arja was assigned by Mr. Sawatzky's

worker's compensation carrier.  Dr. Arja saw Mr. Sawatzky on August 24, 2009;

September 14, 2009; and November 10, 2009.

43.     Dr. Arja found some tightness and spasms in Mr. Sawatzky's back.  Dr. Arja treated Mr. Sawatzky with pain medications and anti-inflammatories.  He also recommended physical therapy.   Generally, Mr. Sawatzky reported a lack of improvement.  In December 2009, Mr. Sawatzky was seen in Dr. Arja's office by a Dr. Ryndfleisz, D.O., who referred him to a physiatrist – Ellen Price, D.O., P.C.

44.     Dan Babbel, P.T., is a physical therapist to whom Mr. Sawatzky was referred. Based on the time of treatment, the referral would have most likely been by Dr. Arja.  Mr. Babbel first saw Mr. Sawatzky on September 14, 2009, and continued providing physical therapy through 2012.  Mr. Babbel testified, and his records show, that the referring physician was Dr. Price.  The discrepancy is unexplained.

45.     Glenn Madrid, M.D., is a family physician who began treating Mr. Sawatzky in 1999 and has consistently provided healthcare to him since that time.  Dr. Madrid testified that prior to the August 17, 2009 accident, Mr. Sawatzky had no major issues with his neck or back.

46.     Dr. Madrid testified that during a health maintenance evaluation in early December 2009, approximately three and a half months after the accident, Mr. Sawatzky did not have any complaints related to his neck, back or shoulders, and Dr. Madrid noted no loss of movement, pain or impairments there.

47.     Dr. Price first saw Mr. Sawatzky on January 5, 2010.  Mr. Sawatzky had lumbar, cervical, sacroiliac and leg pain, and numbness in his fingers.  She also saw Mr. Sawatzky on February 5, 2010; April 2, 2010; April 27, 2010; June 9, 2010; and July 6, 2010.  She did not see him again until July 17, 2013, at his attorney's request.

48.   Dr. Price initially treated Mr. Sawatzky in a variety of ways.  These included medications, devices such as a "TENS unit" and traction device, trigger point injections and a chiropractic referral.  An MRI was taken of Mr. Sawatzky's spine, revealing a bulge at C5-C6.  Ultimately, Dr. Price concluded that Mr. Sawatzky had a 5% cervical impairment, a 14% impairment of the lumbar spine, and an 18% whole body impairment.  She considered the impairments to be permanent, but partial in nature.

49.   Ben Dorenkamp, D.C., was the chiropractor to whom Dr. Price referred Mr. Sawatzky.  Dr. Dorenkamp provided chiropractic services to Mr. Sawatzky on numerous occasions in 2010 and 2011, beginning February 9, 2010, and ending about September 23, 2011.  Mr. Sawatzky's pain persistently returned after treatment.  Dr. Dorenkamp referred Mr. Sawatzky to orthopedic care due to his lack of progress with treatment.

50.   Kirk Clifford, M.D., is an orthopedic spine specialist and the doctor to whom Dr. Dorenkamp referred Mr. Sawatzky.  Dr. Clifford first saw Mr. Sawatzky on September 7, 2011.  Mr. Sawatzky was complaining of neck pain, headaches, low back pain, and right leg pain.  After a period of conservative treatment – physical therapy, icing and anti-inflammatories – Dr. Clifford referred Mr. Sawatzky to Dr. Frazho of his office for evaluation to determine whether steroid injections to the spine joints would be helpful.

51.   Dr. Frazho, M.D., is an orthopedic spine specialist who tends to treat patients in a non-surgical manner.  Mr. Sawatzky was referred to Dr. Frazho by Dr. Clifford

for this reason, as Dr. Clifford did not consider Mr. Sawatzky to be a likely surgical candidate.

52.  Dr. Frazho first saw Mr. Sawatzky in December 2011 and continued to see him through approximately November 2012.  During that time, Dr. Frazho obtained a lumbar MRI and cervical MRI.  The lumbar MRI revealed multi-level disk degeneration and arthritis.  The cervical MRI revealed facet arthritis and disk issues at C-5 and C-6.  Dr. Frazho also reviewed x-rays from prior medical treatment.

53.  Dr. Frazho employed more invasive techniques than had been used previously in the treatment of Mr. Sawatzky.  These included cervical facet joint steroid injections in February and September 2012.  Lumbar facet injections were given in January, March, August and October 2012.  An epidural injection was given in April 2012.  A lumbar medial branch block was performed in September and October 2012.  A radio frequency ablation was also performed in October 2012.  This latter procedure involved burning away the nerve endings of those nerves transmitting pain.  (The nerve endings grow back.)  None of these procedures resulted in more than short-term pain relief.  Dr. Frazho testified that Mr. Sawatzky would benefit from further ablation treatments in the future.

54.  Doris Shriver, OTR, FAOTA, QRC, CLCP, testified as an occupational therapist, qualified rehabilitation consultant, vocational expert and certified life care planner.  She was retained by Mr. Sawatzky's counsel to perform a personal injury evaluation.  She performed that assessment in April 2012.

55.   Ms. Shriver performed a range of tests on Mr. Sawatzky and determined that he had a number of physical limitations related to his neck and back which impacted his ability to work.  Ms. Shriver calculated that, whereas Mr. Sawatzky was at one time in the 65th percentile of vocational abilities for plumbers, he had been reduced to the 14th percentile and would only be able to work, with limitations, less than full time.

56.   Billing records of Mr. Sawatzky's various treating service providers were introduced into evidence.

57.   James Grisier, C.P.A., testified as a certified public accountant and certified valuation analyst.  Mr. Grisier was retained by Mr. Sawatzky's counsel to perform a lost income valuation.  Mr. Grisier examined Mr. Sawatzky's business tax returns, Ms. Shriver's report, Dr. Price's report, Mr. Sawatzky's medical expenses and other documentation.

58.   Mr. Grisier computed Mr. Sawatzky's damages based on two alternative future work scenarios considered by Mr. Shriver.  Computed damages consisted of past and future lost earnings and benefits and costs of past and future medical expenses.  Mr. Grisier did not include in his computations an amount related to future radio-frequency ablation treatments as Mr. Sawatzky had not received a recommendation for such future treatments by the time Mr. Grisier prepared his report.  Regardless, Mr. Grisier computed Mr. Sawatzky's past and future losses, in present value dollars, to be either $880,890 (Shriver scenario 2: earnings reduced by one-half through remaining work life) or $1,099,229 (Shriver scenario 1: earnings reduced by 25% per year).

59.   Most of the physical/medical witnesses who testified were uniform with respect to the following: (i) the human body is more susceptible to injury when forces are exerted on the body while it is in a non-neutral position (e.g., bent over); (ii) a person can have degenerative conditions in his or her back which are asymptomatic; and (iii) asymptomatic conditions may sometimes become symptomatic upon the occurrence of trauma – even minor trauma.  The Court accepts these broad principles as true.

60.   In 1989, Mr. Sawatzky dislocated his left shoulder and had surgery.

61.   In 2002, Mr. Sawatzky was involved in an automobile accident, injuring his head, rib and forearm.  He was also involved in automobile collisions in 1979 and 2008 in which he testified that no injuries were sustained.

62.   Mr. Sawatzky testified that he had no significant neck or back pain in the period of time in between the occurrence of these incidents  and the August 17, 2009 collision.

63.   Many of the physical/medical witnesses who testified opined that Mr. Sawatzky's injuries were caused by the accident of August 17, 2009.  These opinions ranged from relatively certain (Dr. Price – "Well, the trauma made his arthritis worse, absolutely."), to the nuanced (Dr. Clifford – "not likely the root cause of all of his problems...[but]...the triggering factor for his continued complaints."), to the merely possible (Dr. Frazho – "possible accident...started or...contributed to his neck and back...").  In all instances in which opinions were rendered as to the cause of Mr. Sawatzky's injuries being the August 17, 2009 accident, those opinions were formed on the basis of the statements of Mr. Sawatzky as to his

whereabouts and positioning at the time of impact, the particulars of the events of the accident (some practitioners reference the van being knocked forward about a foot in distance; others – *e.g*., Dr. Numsen – were told that the impact "dented" the bumper on Mr. Sawatzky's "1 ton van"), and Mr. Sawatzky's pain, both before and after the accident.  Because of this, the Court will not accept these opinions as factual findings as to causation without an analysis of Mr. Sawatzky's credibility.

64. In July 2012, the USPS undertook surveillance of Mr. Sawatzky and shot video of his activities in public on July 9, 10 and 18.  The videos did not show any remarkable activity by Mr. Sawatzky, but did show him going into and out of customer locations and having a vehicle serviced.  The videos were admitted into evidence.  Portions of these videos (the "surveillance videos") were shown to Mr. Sawatzky by his counsel during his direct testimony.  And with respect to such portions, Mr. Sawatzky narrated the surveillance videos.

65. Mr. Sawatzky's narration of the surveillance testimony was not credible.  In multiple instances in which Mr. Sawatzky was engaging in ordinary movements or postures (such as leaning against a wall with one hand, with the other hand on his hip, or squatting), Mr. Sawatzky would explain that he was actually stretching his back or adjusting his position to avoid pain.  This was a repeated explanation as to any questionable movement.

66. One portion of the surveillance video was neither played for Mr. Sawatzky during trial nor narrated by him.  That portion was taken on July 18, 2012 and showed Mr. Sawatzky stepping out into the street to assist a truck backing out of a

driveway.  Mr. Sawatzky's van was parked on the street in a manner that would obscure the view of the driver.  Mr. Sawatzky stepped into the street, turned his head rapidly and easily to the right to look for oncoming traffic, and when clear, signaled for the truck to enter the street.

67.   As noted previously, there was testimony at trial from Doris Shriver, OTR, FAOTA, CLCP.  She testified, in the presence of Mr. Sawatzky, that as of her April 2012 examination of Mr. Sawatzky, he was unable to turn his head normally and had to compensate by turning his torso when he wished to see something to his side.

68.   At trial, the witness box was situated such that for any witness to look at the Court, the witness could only do so by turning his or her head to the right.  In every instance in which Mr. Sawatzky looked at the Court, he quite obviously kept his head still and rotated his entire torso in a manner consistent with the testimony of Ms. Shriver, but strikingly inconsistent with the fluidity demonstrated in the referenced portion of the surveillance video.

69.   The Court observed Mr. Sawatzky's movements in the courtroom throughout the course of the trial, and could compare them to this movements in the surveillance video.  There was a marked and obvious difference between the two – not so much in terms of what Mr. Sawatzky could do, but rather in terms of the fluidity of movement.  The fluidity of Mr. Sawatzky's movements in the surveillance videos was noticeably smoother than his movements in court during the course of trial.

70.    Neil Pitzer, M.D., performed an independent medical examination of Mr. Sawatzky in October of 2012. Dr. Pitzer was retained by the Defendant. Dr. Pitzer testified for the United States that there was no evidence of significant spinal injury suffered by Mr. Sawatzky in the August 2009 accident. Dr. Pitzer opined that the spinal issues experienced by Mr. Sawatzky since the accident were the result of degenerative changes and symptom magnification motivated by secondary gain.

71.    The Court does not give weight to the opinions of Dr. Pitzer due in part to his access to and review of only a limited portion of Mr. Sawatzky's medical records and due to his awkward and unconvincing explanations of his veracity in a prior case with respect to the occurrence of a DUI arrest.

72.    On May 3, 2011, Mr. Sawatzky filed an administrative claim for damages with USPS in the amount of approximately $521,000. USPS made no determination with respect to this claim.

73.    Presently, Mr. Sawatzky does have significant spinal conditions, including arthritis and degenerative conditions.

74.    The Court finds that Mr. Sawatzky's testimony as to causation was not credible.

75.    The Court finds that there is insufficient evidence that the August 2009 accident caused Mr. Sawatzky's injuries.

## II.  CONCLUSIONS OF LAW

**A.**　**Federal Tort Claims Act**

The United States is immune from suit except where it consents. *State Farm Fire & Cas. Co., Inc. v. United States*, No. CIVA06CV01135-WYDMJW, 2008 WL 5083502 (D. Colo. Nov.

25, 2008) (citing *United States v. Mitchell*, 463 U.S. 206, 212 (1983)).  The FTCA represents a

waiver of the United States' immunity and must, therefore, be strictly construed.  *Pipkin v. U.S.*

*Postal Service*, 951 F.2d 272, 275 (10th Cir. 1991).  The FTCA waives sovereign immunity for

actions against the United States resulting from injuries caused by the negligent acts of

governmental employees while acting in the scope of their employment.  28 U.S.C. § 1346(b)(1);

*Aragon v. United States*, 146 F.3d 819, 822 (10th Cir. 1998).  Defendant's liability is defined "in

accordance with the law of the place where the [allegedly negligent] act or omission occurred."

28 U.S.C. § 1346(b); *see also Flynn v. United States*, 902 F.2d 1524, 1527 (10th Cir. 1990).

Because the act in question occurred in Grand Junction, Colorado, the substantive law of

Colorado applies.

In Colorado, to establish a claim based upon negligence, the plaintiff must show that: (1)

defendant owed plaintiff a legal duty; (2) defendant breached that duty; (3) plaintiff was injured;

and (4) defendant's breach of that duty was the proximate cause of plaintiff's injury.  *Martinez v.*

*Lewis*, 969 P.2d 213, 217 (Colo. 1998).  As noted in this Court's findings of fact above, there

was a duty of care owed to Mr. Sawatzky by Defendant, and that duty was breached on the day

of the accident.  The sole remaining issues to be decided, therefore, are whether the injuries Mr.

Sawatzky complains of were caused by the breach, and if they were caused by the breach, what

damages are owed to Mr. Sawatzky.[1]

**B.**     **Causation**

_____

[1] There is an additional damage issue, which this opinion will not reach as it is unnecessary to decide given that I am finding against Mr. Sawatzky as to causation, but I note it here for the record.  Mr. Sawatzky submitted an administrative claim with USPS on May 3, 2011 in the amount of $521,129.70.  Ordinarily, the amount sought in the administrative claim serves to cap a plaintiff's recovery.  Mr. Sawatzky filed his Complaint in this matter on December 7, 2011, and argues that in the time between the filing of his administrative claim and his Complaint, "new and intervening facts arose with respect to [Mr.] Sawatzky's treatment…[which] should result in [Mr.] Sawatzky being permitted to recover damages in excess of the [amount] demanded in his administrative claim." (ECF No. 58 at 2.)

"A finding of negligence does not create liability on the part of a defendant unless that negligence caused the plaintiff's injury." *Smith v. State Comp. Ins. Fund*, 749 P.2d 462, 464 (Colo. Ct. App. 1987).  The word "cause" means an act or failure to act which in natural and probable sequence produced the claimed injury; a cause without which the claimed injury would not have happened.  *Id.*  To establish causation, "the plaintiff need not prove with absolute certainty that the defendant's conduct caused the plaintiff's harm … however, the plaintiff must establish causation beyond mere possibility or speculation."  *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 988 (Colo. Ct. App. 2011) (citations omitted).  To prove causation under Colorado law, a plaintiff must establish that "but for" the alleged negligence he would not have been injured.  *Id.*

As noted in the findings of fact, it is clear that Ms. Gurule's vehicle backed into Mr. Sawatzky's van on August 17, 2009.  It is less clear where exactly Mr. Sawatzky was in relationship to his vehicle when the impact occurred, or what effect the impact had upon Mr. Sawatzky's body.  The sole evidence that Mr. Sawatzky was physically affected by this collision, and in fact, the sole evidence that Mr. Sawatzky was even in contact with his van when it was hit, is Mr. Sawatzky's testimony.

The Court has found that the accident in question involved mild contact in the nature of a tap.  Such a tap did not impact Mr. Sawatzky in the manner claimed in this testimony.  Clearly, the testimony of a single witness can be sufficient to establish causation or any other matter.  Equally clear, if a witness is not deemed credible, some or all of his testimony may be discounted.  *See generally* § 2586 Findings of Fact—Credibility of Witnesses, 9C Fed. Prac. & Proc. Civ. § 2586 (3d ed.) ("The court need not accept even uncontradicted and unimpeached testimony if it is from an interested party or is inherently improbable."); *Manning v. U.S.*, 146

F.3d 808, 813 (10th Cir. 1998) (district court's factual findings based on credibility

determinations are afforded a heightened degree of deference).

In this case, the Court does not find Mr. Sawatzky to be a credible witness – either with

respect to the accident, the impact of the accident on his body, or his reports of pain caused

thereby.  Accordingly, I discount his testimony as to the accident in its entirety and am left with

no evidence sufficient to meet Mr. Sawatzky's burden as to causation.  To the extent that the

various medical opinions are looked to in order to fill that gap, they cannot do so.  As indicated

in the findings of fact, all of those opinions are based upon what Mr. Sawatzky told his treatment

providers.  As such, they too rise and fall with my analysis of Mr. Sawatzky's credibility.

In concluding that Mr. Sawatzky is not credible, I do not base this conclusion on any

specific single or combination of testimonial concerns.  Rather, my conclusion is based on my

broad based assessment of him, my observations of him throughout trial, my assessment of his

testimony, my consideration of differing or competing testimony, and the impression he

presented.  While the findings of fact offer some discrete instances of difficulty with Mr.

Sawatzky's testimony (as when he testified that his vehicle moved a foot, that he went

immediately to Community Hospital, his account of the skid marks issue, and the inconsistency

between appearances in Court and surveillance video), I emphasize that the credibility

determination is not based on any one of these or any combination thereof.  Rather, as the finder

of fact, I conclude based on a multitude of impressions and considerations that he is simply not

credible.

Mr. Sawatzky did not meet his burden of proof of establishing that the August 17, 2009

collision was the "but for" cause of his injuries.  Here, any number of factors may have brought

about Mr. Sawatzky's injuries.  This Court will engage in no speculation as to the cause of his

injuries, but Mr. Sawatzky's attempt to root his current medical problems in a slow-speed fender bender was ultimately unpersuasive.

## III. CONCLUSION

Plaintiff bore the burden at trial of establishing each of the four elements of negligence. Duty and breach were conceded by Defendant, and Plaintiff put on significant evidence to establish that he has had and continues to have pain and back difficulties. The linchpin element was to establish that the breach was the proximate cause of those injuries. He ultimately failed to establish this. The Court finds that Plaintiff did not meet his burden of proving by a preponderance of the evidence that the collision was the proximate cause of his injuries. Therefore, it is:

ORDERED that judgment shall enter in favor of Defendant and against Plaintiff.


DATED this 19th day of September, 2013.

BY THE COURT:


RAYMOND P. MOORE
United States District Judge